■ WILLIAM BROCK, Respondent, v STATE OF NEW YORK, Appellant. (Claim No. 50471.) JEANNETTE HENDELSON, Respondent, v STATE OF NEW YORK, Appellant. (Claim No. 50180.) MORRIS SWARTZ, as Administrator of the Estate of LINDA D. HENDELSON, Deceased, Respondent, v STATE OF NEW YORK, Appellant. (Claim No. 50236.) BENNETT ADELMAN, as Administrator C. T. A. of the Estate of PHILIP HENDELSON, Deceased, Respondent, v STATE OF NEW YORK, Appellant. (Claim No. 50806.)—Appeals from judgments, entered August 16, 1976, upon a decision of the Court of Claims. These four claims seek damages for personal injuries and wrongful death arising out of collisions which occurred on Route 17, near Bridgeville, New York. Following a joint trial, the Court of Claims awarded judgment in favor of the claimants on the issue of liability only. The claims of Brock, Hendelson, Swartz, as administrator, and Adelman, as administrator (the latter three are hereinafter collectively referred to as the "Hendelson" claims) evolve from two similar accidents which occurred during the months of May and June, 1968, at virtually the identical place, under virtually identical conditions and in virtually the same manner. Each of the accidents occurred after truck drivers crossed the bridge over the Neversink River on the eastbound side of a divided highway while it was raining. The bridge is located at the bottom of two steep grades, 7% on the west side and 5% on the east side. There are curves on the east side of the bridge. As to the Hendelson claims, on May 11, 1968, at 11:00 P.M., Thomas J. Madigan was driving a tractor-trailer owned by Frank Van Wagner Horse Transportation, Inc., eastbound on Route 17, at the hamlet of Bridgeville, Sullivan County, New York, at a time when it was raining. Madigan testified that as he crossed the bridge spanning the Neversink River, at a speed of approxi-

mately 40 miles per hour, his vehicle skidded, jackknifed and proceeded to its left across the mall into the westbound lane where it collided with an automobile owned by Jeannette Hendelson and operated by her husband Philip. Mr. Hendelson and Linda, his 19-year-old daughter, were killed, and Jeannette Hendelson was seriously injured. This accident happened at Station 196 + 45. Brock's claim arose June 12, 1968 when he was operating his tractor-trailer eastbound on Route 17 near Bridgeville, New York, in the rain. He crossed the bridge and immediately thereafter, his vehicle jackknifed, went into the soft shoulder on his right, on into the rock bank, bounced left across the eastbound lane and came to rest in the mall, seriously injuring Brock. The only distinction between the Hendelson and Brock accidents is that after the skidding occurred, each tractor-trailer jackknifed in the opposite direction. However, the speeds of both vehicles were approximately the same, the weather and highway conditions were the same, each trailer was empty, and the accidents occurred within 60 feet of each other. There were no signs warning of slippery, wet conditions at the site of the accidents. The construction of the highway, built in 1955, called for a 50-mile-per-hour speed limit. This was increased to 60 miles in 1963 and in 1967, to 65 miles per hour. The rationale for these increases was essentially because of the large number of speed violators, since the police could not effectively enforce the existing speed limit. Prior to the accidents herein involved, over a period of 34 months, there were at least 34 accidents on the eastbound lane within several hundred feet of each other occurring under similar circumstances. All of these accidents took place during wet road conditions, and at the same curve. The State was aware that this was a high accident area and had been alerted to the situation many months preceding the accidents which are the subject of these claims. Irate citizens had complained of the dangerous condition which existed near the scene of the accident as early as two years before these claims accrued. On one occasion, an on-site safety inspection of the highway was made which was attended by the State traffic engineer and the district engineer and investigations were promised by responsible State officials. Newspaper articles also appeared, calling attention to the problem. Numerous tests, such as the ball bank indicator and coefficient friction tests were conducted by the State in an effort to determine the cause of the accidents, but unfortunately, these friction tests were performed during the most favorable driving conditions when the highway surface was dry, and revealed nothing. Other tests were performed during rainy conditions, but were disregarded since no readings were obtainable. The trial court noted that it was "folly" for the State "to increase the highway's operating speed without weighing the frequency of accidents, original 'as built' plans under all driving conditions, wearing or worn and broken road surfaces, together with the placement of appropriate signs". The trial court found that the curve was not built to permit reasonably safe travel at high speeds. Centrifugal force, together with aquaplaning, because of the presence of water and worn road surfaces, caused dangerous conditions to exist, greatly increasing the hazards of accidents. The trial court further noted that "To increase the speed limit without appropriate warning or regulatory devices such as 'Slippery When Wet' or 'Reduce Speed' signs was nothing short of an accommodation for speeders that compounded the mischief and evinced an indifference to the available indicia bearing upon the causes of the accidents". We concur in the trial court's conclusion that the State should have been aware that a dangerous condition existed at the scene of the accidents, particularly during wet weather. The unusual rate of accidents, the worn riding surface

717

of the bridge and roadway, the complaining letters, the community meetings and the mountainous terrain all combine to charge the State with actual knowledge of the dangerous condition. Furthermore, the record contains concessions by State witnesses that warning signs should have been placed at the scene. Thus the weight of the evidence supports the trial court's finding that the State was negligent in failing to post signs affording timely warning to motorists that they were approaching a segment of the road where uncommon dangers existed (*Canepa v State of New York*, 306 NY 272). We further agree that the proximate cause of claimants' injuries was the breach of the State's duty to warn motorists. Corbin, the State's claims engineer, testified that although the design speed of Route 17 was 50 miles per hour, the posted and signed speed limit on the dates of the accidents was 65 miles per hour. Corbin testified that design speed "is the maximum safe speed that can be maintained over a specified section of highway when conditions are so favorable that the design features of the highway govern". Coupled with this evidence is the testimony of claimants' engineer Porter, who testified that the average running speed for a highway with a 50-mile-per-hour "design speed" was 40 miles per hour "under normal, average conditions". It seems apparent that a sharp turn at the bottom of two steep inclines, insufficient super-elevation and wet pavement do not constitute favorable conditions. It is our conclusion that the posted speed limit of 65 miles per hour was far in excess of a safe speed under wet conditions and these signs led the drivers to believe that their speed was comfortably and reasonably safe when in fact the evidence indicates their speed was marginally safe at best under the conditions then existing. The evidence supports the conclusion of the trial court that the State's negligence was the proximate cause of the accidents. Finally, we find no evidence in the record that the drivers of the vehicles involved in these accidents were in any way guilty of negligence contributing to the accident. Judgments affirmed, with costs. Koreman, P. J., Greenblott, Sweeney, Kane and Main, JJ., concur.